1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CHRIS WERDEBAUGH,

        Plaintiff,

    v.

BLUE DIAMOND GROWERS,

        Defendant.

Case No.  12-CV-02724-LHK

**ORDER GRANTING MOTION TO DECERTIFY**

[Public version]

Re: Dkt. No. 167

Plaintiff Chris Werdebaugh ("Werdebaugh" or "Plaintiff") brings this class action against Defendant Blue Diamond Growers ("Blue Diamond" or "Defendant"), alleging that Defendant's package labeling is unlawful, deceptive, and misbranded in violation of California law. Defendant moves to decertify the class. ("Motion"), ECF No. 167. Plaintiff filed an opposition, ("Opp.") and request for judicial notice ("RJN"), ECF Nos. 175, 176. Defendant filed a reply. ("Reply"), ECF No. 180. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby GRANTS Defendant's motion to decertify the class.

## I.      BACKGROUND

### A.      Factual Background

Blue Diamond is a California corporation and a leading producer of almond milk products and snack foods. *See* Second Am. Compl. ("SAC") ¶¶ 17–18. Blue Diamond sells the vast majority of its products—more than 99.9%—to retailers and distributors for eventual sale to consumers at grocery and other retail stores throughout the United States. Declaration of John O'Shaughnessy in Support of Blue Diamond Growers' Opposition to Plaintiffs' Motion for Class Certification ("O'Shaughnessy Decl."), ECF No. 99, ¶¶ 4, 5.

Werdebaugh is a California consumer who purchased Blue Diamond's shelf stable Chocolate Almond Breeze almond milk product ("Purchased Product") as a healthy "treat" alternative to white dairy milk for his children. *See* Deposition of Christopher Werdebaugh ("Werdebaugh Depo"), ECF No. 101-1 at 69, 80. Since April 11, 2008, Werdebaugh purchased four cartons of the Purchased Product at $3–4 per carton. Werdebaugh Depo at 75, 107–08, 143–44. Werdebaugh contends that the Purchased Product's label bears false, misleading, and unlawful claims. Specifically, the label statements on the Purchased Product alleged to be false and misleading include: (1) listing the sweetener used in its almond milk products as "'evaporated cane juice' . . . when the ingredient . . . was actually sugar[]"; and (2) including the statement "All Natural" when, in fact, the products contain synthetic ingredients. SAC ¶¶ 31, 42. Werdebaugh asserts that he "reasonably relied on those statements for his purchase decision, and would not have bought the product otherwise." *Id.* ¶ 6.

In addition to the Purchased Product, the SAC identifies eighteen additional Blue Diamond products that are substantially similar to the variety Werdebaugh himself purchased. SAC ¶ 85. Of those eighteen substantially similar products, eleven varieties are labeled with the ingredient evaporated cane juice; and seven varieties are labeled "All Natural" despite containing synthetic ingredients. *See id.*; *see also* ECF Nos. 74-1, 74-2, 74-3, 74-4, 74-5, 74-6, 74-7, 75-1, 75-2, 75-3, 75-4 (Blue Diamond product labels with "Evaporated Cane Juice" statements); 78, 78-1, 78-2, 78-

2

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

3, 78-4, 78-5, 78-6 (Blue Diamond product labels with "All Natural" statements).

### 1.      Evaporated Cane Juice Claims

Werdebaugh alleges that Blue Diamond's use of the term "evaporated cane juice" as an ingredient on the package labels of the Purchased Product and substantially similar products violates federal regulations and California law. SAC ¶¶ 42–46. Specifically, Werdebaugh contends that Defendant's use of the term "evaporated cane juice" violates: (a) the FDA's definition of the term "juice"; (b) the FDA's requirements for identifying cane syrup on food labels; and (c) the FDA's blanket requirement that foods must be referred to by their common or usual names and not by names "confusingly similar to the name of another food that is not reasonably encompassed within the same name." *Id.* (quoting 21 C.F.R. § 102.5(a)).

First, according to Werdebaugh, 21 C.F.R. § 120.1(a) defines "juice" as "the aqueous liquid expressed or extracted from one or more fruits or vegetables, purees of . . . fruits or vegetables, or any concentrates of such liquid or puree." *Id.* (quoting FDA October 2009 Guidance for Industry Letter) (internal quotation marks omitted). Although sugar cane is a vegetable, Werdebaugh represents that the FDA "considers the term 'vegetable' in the context of the juice definition to refer more narrowly to edible plant parts that consumers are accustomed to eating as vegetables in their diet." *Id.* Because "the juice or extract of sugar cane is not the juice of a plant that consumers are accustomed to eating as a vegetable in their diet," sugar cane or any extract of sugar cane does not qualify as "juice" under the regulation defining that term. *Id.* Second, Werdebaugh asserts that federal regulations not only proscribe identifying sugar cane and cane syrup as "juice," but mandate that sugar cane be identified as "sugar" or "syrup." *Id.* (citing 21 C.F.R. §§ 101.4(b)(20) (sugar); 168.130 (cane syrup)). Third, Werdebaugh alleges that use of the term evaporated cane juice violates the FDA's requirement that ingredients be described by their common or usual names, as established by regulation or common usage. *Id.* ¶ 44 (citing 21 C.F.R. § 102.5(d)). Because evaporated cane juice is "'confusingly similar to the name of [another] food that is not reasonably encompassed within the same name,'" Werdebaugh contends that the term

United States District Court
Northern District of California

United States District Court
Northern District of California

1    cannot satisfy the FDA's common name or usage requirement, and is misleading and deceptive in

2    violation of California and federal law. *Id*. ¶¶ 42–46 (quoting 21 C.F.R. § 102.5(a)).

3           Plaintiff contends that the FDA's intention to regulate evaporated cane juice based on these

4    requirements is expressed in an October 2009 Guidance for Industry letter on the topic ("2009

5    Guidance"). *Id*. ¶ 46.

6                        **2.     "All Natural" Claims**

7           Werdebaugh also alleges that Blue Diamond's use of the term "All Natural" on the

8    Purchased Product and Substantially Similar Products violates federal regulations and California

9    law. *Id*. ¶ 31. Werdebaugh asserts the artificial ingredient potassium citrate is present in the

10   Purchased Product and Substantially Similar Products labeled "All Natural." *Id*. ¶ 62. Werdebaugh

11   argues that 21 C.F.R. § 101.22 prohibits Defendant from labeling its products as "All Natural"

12   when those products contain potassium citrate. *Id*. ¶ 34. According to Werdebaugh, the FDA has

13   "repeatedly affirmed" this policy in regulatory publications, *see* 58 Fed. Reg. 2302-01, 2407 (Nov.

14   6, 1993), policy guidelines, *see* FDA Compliance Policy Guide § 587.100, and "numerous

15   warning letters." *See* SAC ¶¶ 33, 35–36. Werdebaugh contends that Defendant's labeling

16   representation that the Purchased Product and Substantially Similar Products are "All Natural " is

17   false and misleading in violation of California law and federal regulation because these products in

18   fact contain the ingredient potassium citrate. *Id.* ¶¶ 62–63.

19             **B.     Class Claims**

20          Werdebaugh alleges that by manufacturing, advertising, distributing, and selling

21   misbranded products, Defendant has violated California Health & Safety Code Sections 110390,

22   110395, 110398, 110400, 110660, 110720, 110725, 110735, 110740, 110760, 110765, and

23   110770. *See* SAC ¶¶ 64–75. In addition, Werdebaugh asserts that Defendant has violated the

24   standards set by 21 C.F.R. §§ 101.4(a)(1), 101.22, 101.30, 102.5(a), 102.5(d), and 120.1(a), as

25   well as by 21 U.S.C. § 343, which have been incorporated by reference into California's Sherman

26   Food, Drug, and Cosmetic Act ("Sherman Law"), Cal. Health & Safety Code §§ 109875 *et seq.*

27
                                                       4

28

United States District Court
Northern District of California

1  *See* SAC ¶ 76; *see also* Cal. Health & Safety Code § 110100 ("All food labeling regulations and

2  any amendments to those regulations adopted pursuant to [federal statutes governing food

3  labeling] in effect on January 1, 1993, or adopted on or after that date shall be the food regulations

4  of this state.").

5  Based on these alleged regulatory and statutory violations, Werdebaugh's SAC alleges the

6  following causes of action: (1) violation of California's Unfair Competition Law ("UCL"), Cal.

7  Bus. & Prof. Code §§ 17200 *et seq*., for unlawful, unfair, and fraudulent business acts and

8  practices (claims 1, 2, and 3); (2) violation of California's False Advertising Law ("FAL"), Cal.

9  Bus. & Prof. Code §§ 17500 *et seq*., for misleading, deceptive, and untrue advertising (claims 4

10 and 5); and (3) violation of the CLRA, Cal. Civ. Code §§ 1750 *et seq*. (claim 6). *See* SAC ¶¶ 96–

11 155.

12 ### C.    Procedural History

13 Werdebaugh filed his original Complaint on May 29, 2012. ECF No. 1. Blue Diamond

14 filed an Answer on September 25, 2012. ECF No. 20. The Parties stipulated to Plaintiff filing an

15 amended complaint as well as to the Court dismissing with prejudice claims in the original

16 Complaint based on the Magnuson-Moss Warranty Act and Song-Beverly Consumer Warranty

17 Act. ECF Nos. 36, 37.

18 Werdebaugh filed his FAC on May 24, 2013. ECF No. 38. Blue Diamond filed its Motion

19 to Dismiss or, in the alternative, to strike particular allegations in the FAC on June 24, 2013. ECF

20 No. 46. Blue Diamond moved to dismiss for four reasons, arguing that: (1) Plaintiff's claims are

21 preempted by the Federal Food, Drug, and Cosmetic Act, on the bases of implied preemption,

22 express preemption, and the doctrine of primary jurisdiction; (2) Plaintiff lacks standing to

23 challenge the substantially similar products because he did not purchase them; (3) Plaintiff's

24 claims are not pled with the particularity required under Fed. R. Civ. P. 9(b); and (4) California's

25 conflict-of-laws analysis prohibits non-California plaintiffs from bringing a claim under the UCL,

26 FAL, or CLRA. *See id*. at i. Blue Diamond moved to strike Werdebaugh's claim for monetary

27 
28 

5

relief under the CLRA arguing that he did not properly seek leave to amend on that basis. *Id*. On

July 22, 2013, Werdebaugh filed his Opposition, ECF No. 48, as well as a request that the Court

take judicial notice of certain exhibits, ECF No. 49. Defendant filed its Reply on August 30, 2013.

ECF No. 58.

On October 2, 2013, the Court denied Defendant's motion to dismiss and motion to strike.

ECF No. 65. The Court denied Blue Diamond's motion to dismiss in full, finding that: (1)

Plaintiff's claims were not preempted by federal law, and application of the doctrine of primary

jurisdiction was not warranted in this case; (2) Werdebaugh had adequately alleged Article III and

statutory standing at the pleading stage with respect to the substantially similar products; (3)

Plaintiff had met the heightened pleading standards of 9(b) with respect to all of his Purchased

Products and substantially similar products claims; and (4) striking the nationwide class

allegations at the motion to dismiss stage would be premature. *Id*. at 14, 16, 18, 20–21; 23–24; 26;

27. Because the Court also found that Werdebaugh's amendment of the CLRA claim was proper,

the Court declined to strike Werdebaugh's claim for monetary relief under the CLRA. *Id*. at 29.

Defendant subsequently filed an Answer to the Amended Complaint on November 1, 2013. ECF

No. 69.

On January 17, 2014, Werdebaugh moved for class certification. ECF No. 74. Defendants

filed an opposition on March 7, 2014, ECF No. 98, along with evidentiary objections to Plaintiff's

expert declarations filed in support of class certification, ECF Nos. 102–03. Plaintiff responded to

Defendant's evidentiary objections on March 20, 2014, ECF Nos. 110–11, and on March 28, 2014

filed a reply, ECF No. 115. Defendant subsequently filed two statements of recent decision, ECF

Nos. 116, 120. The Court held a hearing on May 22, 2014, and on May 23, 2014, the Court issued

an order granting in part and denying in part Plaintiff's motion for class certification. ("Class Cert.

Order"), ECF No. 131. The Court denied Plaintiff's motion to certify an injunctive class, but

granted Plaintiff's motion to certify a Rule 23(b)(3) damages class. *See id.* at 17, 48. The Court

certified the following damages class:

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

> All persons in California who, from May 19, 2008, until the date of notice, purchased almond milk products manufactured, distributed and/or sold by Blue Diamond Growers containing the label statements 'evaporated can juice' and/or 'All Natural.' The following persons are expressly excluded from the Class: (i) Defendant and its subsidiaries and affiliates; (ii) all persons who make a timely election to be excluded from the Class; (iii) governmental entities; and (iv) the Court to which this case is assigned and its staff.

Class Cert. Order at 48. With respect to the damages class, Plaintiff's damages expert, Dr. Oral Capps, proposed three damages models: a "full refund" model, a "price premium" model, and a regression model. *Id.* at 39–41. The Court rejected the "full refund" and "price premium" models because they were inconsistent with Plaintiff's liability case and unable to "offer a class-wide measure of damages that is tied to" the harm attributable to Defendant's labeling claims. *Id.*

The Court did, however, accept Dr. Capps' proposed regression model as an acceptable damages model under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). According to Dr. Capps, his proposed regression model would control for factors such as "price of the product, prices of competing and complementary products, income, advertising, seasonality, and regional differences." Class Cert. Order at 46. "By controlling for these factors and considering differences in sales of [Defendant's] products before and after" Defendant began using the labeling language at issue, Dr. Capps' proposed model would provide a "quantitative measure of damages." *Id.* The Court rejected Defendant's arguments regarding the robustness of Dr. Capps' proposed regression analysis as premature or inapposite in light of Dr. Capps' description of his proposed methodology. *See, e.g.*, *id.* at 43 ("[T]he proposed regression here contemplates factors other than the alleged misbranding which might influence price changes over time, including expenditures associated with the advertising . . . , prices of complementary products, disposable personal income of consumers, and population. . . . [W]hile Dr. Capps has yet to run the model . . . he sets forth . . . a workable model of calculating damages.").

Following the Court's order on class certification, Plaintiff filed a Second Amended Complaint on June 3, 2014. ECF 136. On October 30, 2014, Defendant filed a motion to decertify

7

the damages class. ECF No. 167. Plaintiff filed his opposition on November 13, 2014. ECF No.

175. As exhibits to his opposition, Plaintiff attached a "Second Supplemental Report" by Dr.

Capps. *Id.* Plaintiff also filed a request for judicial notice.[1] ECF No. 176. Defendant filed its reply

on November 20, 2014, which included a request that the Court strike Dr. Capps' Second

Supplemental Report. ECF No. 180.

## II.      Legal Standard

"Even after a certification order is entered, the [Court] remains free to modify it in the light

of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160

(1982); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification

may be altered or amended before final judgment."). "The standard used by the courts in

reviewing a motion to decertify is the same as the standard when it considered Plaintiffs'

certification motions." *Ries v. Ariz. Beverages USA LLC*, No. 10-01139, 2013 WL 1287416, at *3

(N.D. Cal. Mar. 28, 2013). "On a motion for decertification, the burden remains on the plaintiffs to

demonstrate 'that the requirements of Rules 23(a) and (b) are met.'" *Id.* (quoting *Marlo v. United

Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011)); *see also Negrete v. Allianz Life Ins. Co. of

N. Am.*, 287 F.R.D. 590, 598 n.1 (C.D. Cal. 2012) ("To the extent that pre-*Marlo* cases conclude

that a defendant bears the burden on a motion to decertify of demonstrating that 'the elements [of]

Rule 23 have not been established,' *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140[,

---

[1] Plaintiff requests that the Court take judicial notice of two articles concerning hedonic price regression and econometric analysis. ECF 176. Plaintiff argues that the articles are from "learned treatises" and are facts "not subject to reasonable dispute." RJN at 2. Defendant opposes this request and contends that the facts contained within these articles are, in fact, subject to dispute and are not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court first notes that Plaintiff does not identify what adjudicative facts, if any, he requests that the Court notice in the two highly technical journal articles he attaches as "Exhibit D." Moreover, to the extent Defendant disputes the basis of the conclusions and "facts" contained in these articles, the Court concludes that these facts are not appropriate for judicial notice under Rule 201(b). *See, e.g.*, *In re Nuvelo, Inc. Secs. Litig.*, 668 F. Supp. 2d 1217, 1219 (N.D. Cal. 2009); *Ass'n of Irritated Residents v. Fed Schakel Dairy*, No. 1:5-cv-00707 OWW SMS, 2008 WL 850136, at *n.4 (E.D. Cal. Mar. 28, 2008).

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

1    1153] (S.D. Cal. 2007), these cases are no longer good law.").[2]

2         Federal Rule of Civil Procedure 23, which governs class certification, has two sets of

3    distinct requirements that a plaintiff must establish before the Court may certify a class. Plaintiff

4    must satisfy all of the requirements of Rule 23(a) and at least one of the prongs of Rule 23(b).

5         Under Rule 23(a), the Court may certify a class only where "(1) the class is so numerous

6    that joinder of all members is impracticable; (2) there are questions of law or fact common to the

7    class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

8    of the class; and (4) the representative parties will fairly and adequately protect the interests of the

9    class." Fed. R. Civ. P. 23(a). Courts refer to these four requirements, which all must be satisfied to

10   maintain a class action, as "numerosity, commonality, typicality and adequacy of representation."

11   *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 588 (9th Cir. 2012). Further, courts have implied

12   an additional requirement: the class to be certified must be "ascertainable." *Bruton v. Gerber*

13   *Prods. Co.*, No. 12-CV-02412-LHK, 2014 WL 2860995, at *3 (N.D. Cal. June 23, 2014) (citing

14   *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012)).

15        In addition to meeting the requirements of Rule 23(a), the Court must also find that

16   Plaintiff has satisfied "through evidentiary proof" one of the three subsections of Rule 23(b).

17   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). As relevant here, the Court may certify

18   a Rule 23(b)(3) class if it finds that "questions of law or fact common to class members

19   predominate over any questions affecting only individual members, and that a class action is

20   superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

21   23(b)(3).

22        On the whole, "a court's class-certification analysis must be 'rigorous' and may 'entail

23   some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans*

24   *& Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

25

26   [2] Plaintiff argues that the burden of proof shifts to Defendant on a motion to decertify. That is
     incorrect as a matter of law.

27                                              9

28   Case No.: 12-CV-02724-LHK
     ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California

2541, 2551 (2011)); *see also Mazza*, 666 F.3d at 588 ("Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." (internal quotation marks omitted)). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. Within the framework of Rule 23, the Court ultimately has broad discretion over whether to certify or decertify a class. *United Steel Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 809–10 (9th Cir. 2010).

## III.   DISCUSSION

Plaintiff has submitted two different regression analyses conducted by Dr. Capps and requests that the Court review the second damages model for purposes of this motion. Plaintiff submitted the original damages model in Dr. Capps' opening expert report and the second damages model in Dr. Capps' Second Supplemental Report. As the original and second damages models differ in significant respects, the Court begins with the question of whether Plaintiff's second damages model should be excluded for untimeliness. The Court then turns to the substance of Defendant's arguments in support of its motion to decertify the damages class.

### A.   Timeliness of Dr. Capps' Second Supplemental Report

Defendant contends that Dr. Capps' Second Supplemental Report must be excluded under Federal Rule of Civil Procedure 37(c) as an untimely disclosure. The Court addresses this argument below.

The threshold issue is whether Dr. Capps' Second Supplement Report is a valid "supplement" under Federal Rule of Civil Procedure 26(e). As relevant here, under Rule 26, a party must "make expert disclosures at the times and in the sequence that the court orders." *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011). Under Rule 26(e), a party that has made an expert disclosure "must supplement or correct its disclosure . . . in

10

United States District Court
Northern District of California

a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process . . . ." Moreover, Rule 37 "gives teeth" to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed. *Yeti by Molly Ltd v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c)(1) is a "self-executing," "automatic" sanction designed to provide a strong inducement for disclosure. *Id.* The only exceptions to Rule 37(c)(1)'s exclusion sanction are if the failure to disclose is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1)

The Court begins by summarizing the timeline of expert discovery in the instant case. Pursuant to the Court's case schedule, Plaintiff served the opening expert report of Dr. Capps on August 29, 2014. ("Capps Report"), ECF Nos. 142, 150, 156. Defendant served the rebuttal report of Dr. Keith Ugone on September 22, 2014. ("Ugone Rebuttal"), ECF 180-1. On October 7, 2014, Plaintiff served Dr. Capps' supplemental expert report. ("Capps Reply"), ECF No. 161. Expert discovery closed three days later on October 10, 2014. ECF No. 158.

Defendant filed its motion to decertify on October 30, 2014. ECF No. 167. On November 13, 2014, Plaintiff filed his opposition and attached a "Second Supplemental Report" by Dr. Capps. ("Sec. Supp. Rep."), ECF No. 175. Plaintiff's Second Supplemental Report appears to have been filed in response to this Court's November 6, 2014, decision to decertify the damages class in *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-1831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014), in which Dr. Capps proposed effectively the same damages model. On November 20, 2014, Defendant attached to its reply brief a declaration from Dr. Ugone analyzing Dr. Capps' Second Supplemental Report. *See* Declaration of Keith R. Ugone, Ph.D in response to the Second Supplemental Expert Report of Dr. Oral Capps, Jr. ("Nov. 20, 2014 Ugone Decl."), ECF No. 179.

Dr. Capps' Second Supplemental Report contained a new regression analysis that attempted to address some of the criticisms outlined in Dr. Ugone's rebuttal report. More

United States District Court
Northern District of California

11

specifically, Dr. Capps' new damages model, unlike his original model, did not assume that only Defendant's products use "evaporated cane juice" and/or "All Natural" on their labels. Instead, the new model accurately reflected the fact that competitor products by Silk and Pacific also used the "All Natural" labeling claims during the class period.[3] Sec. Supp. Rep. ¶ 11. Additionally, the new model excluded all private label products from the analysis. *Id.* As a result of these changes, the regression analysis in Dr. Capps' Second Supplement Report resulted in a ███ decrease in estimated damages as compared to Dr. Capps' damages figure in his opening expert report. *See* Ugone Decl. ¶ 14. According to Dr. Ugone, Dr. Capps' new damages model reflects a fundamentally new and different methodology from Dr. Capps' original damages model. *See id.* ¶¶ 14–15.

Defendant contends that Dr. Capps' Second Supplemental Report is not a "supplement" under Rule 26(e) because Dr. Capps' changes are based on information that was available to him at the time of his opening expert report and his first supplemental report and well before the close of expert discovery. The Court agrees. Plaintiff does not claim that Dr. Capps' new regression analysis is based on information previously unavailable or unknown to Dr. Capps. That Dr. Capps chose to assume all competitor products did not use the labeling claims at issue rather than investigate those facts does not render that information unknown or undiscovered as required by Rule 26(e). Moreover, Dr. Capps explicitly rejected Dr. Ugone's argument that Silk and Pacific products made the relevant labeling claims in Dr. Capps' first supplemental report. *See* Capps Reply ¶ 17 ("Dr. Ugone's support for this conclusion on competitor labeling claims . . . is not evident in these documents or website links."). To the extent Plaintiff contends that Dr. Capps was obligated to supplement his expert report under Rule 26(e) because of new information raised by

---

[3] The Court notes that this correction does not necessarily address the gravamen of Dr. Ugone's criticism. Dr. Ugone criticized Dr. Capps' failure to conduct any investigation into whether competing and comparable products actually use the labeling claims at issue and offered Silk and Pacific products as examples of Dr. Capps' erroneous assumptions. Even in conducting the second regression analysis, Dr. Capps did not verify whether the non-Blue Diamond products in his dataset did or did not use the labeling claims beyond those exemplars identified by Dr. Ugone.

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

1    Dr. Ugone's rebuttal report, that duty should have been triggered after Dr. Ugone submitted his

2    rebuttal report on September 22, 2014. Instead, Dr. Capps' first supplemental report explicitly

3    rejected the veracity of Dr. Ugone's claim that Silk and Pacific products used "evaporated cane

4    juice" and/or "All Natural" on their labels and Dr. Capps maintained that the original damages

5    model in his opening expert report was sufficient. Under these circumstances, the Court concludes

6    that Plaintiff's arguments regarding Dr. Capps' duty to supplement under Rule 26(e) ring hollow.

7         In the alternative, Plaintiff argues that because trial is more than thirty days away, Dr.

8    Capps' Second Supplemental Report is timely under the pretrial discovery deadlines set forth in

9    Rule 26(a)(3)(B). However, the pretrial deadlines provided in Rule 26(a)(3)(B) apply "[u]nless the

10   court orders otherwise," and here the Court-set case schedule set an expert discovery cutoff of

11   October 10, 2014. Dr. Capps provided a timely supplemental report on October 7, 2014, in which

12   he responded to Dr. Ugone's rebuttal report. That first supplemental report purported to address

13   the same issues that Dr. Capps re-visited in his Second Supplemental Report. Dr. Capps' Second

14   Supplemental Report came more than a month after the close of expert discovery and two weeks

15   after Defendant filed its motion to decertify based on Dr. Capps' opening expert report.

16   Supplemental reports under Rule 26(e) "do not permit a party to introduce new opinions after the

17   disclosure deadline under the guise of a 'supplement.'" *Plumley v. Mockett*, 836 F. Supp. 2d 1053,

18   1062 (C.D. Cal. 2010). Plaintiff's belated realization that Dr. Capps' original regression model

19   apparently suffered from certain flaws the Court found dispositive in the Court's decertification

20   order in *Brazil* does not render Dr. Capps' Second Supplemental Report a valid supplement under

21   Rule 26(a) or 26(e).

22        Untimely disclosures under Rule 26 are subject to exclusion under Rule 37(c) unless the

23   failure to disclose is substantially justified or harmless. Defendant notes that exclusion under Rule

24   37(c) is an "automatic" sanction, and that Plaintiff bears the burden of showing why Rule 37(c)'s

25   sanction should not apply. *See, e.g.*, *Yeti by Molly, Ltd.*, 259 F.3d at 1106; *Torres v. City of Los*

26   *Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008). In the instant case, Plaintiff has offered no reason or

United States District Court
Northern District of California

27                                                         13

28   Case No.: 12-CV-02724-LHK
     ORDER GRANTING MOTION TO DECERTIFY

argument why admitting Dr. Capps' untimely Second Supplemental Report would be substantially justified or harmless. *See* Opp. at 14. Moreover, Defendant argues that Dr. Capps' new damages model is fundamentally different than the original model. Not only did Dr. Capps change thousands of data points, the removal of private label products from the damages model altogether required the omission of multiple brand dummy variables from each of the regression models. *See* Nov. 20, 2014 Ugone Decl. at 9–10. Defendant contends that the changes to Dr. Capps' model are based on a new, changed methodology and result in significant changes to key coefficients. As compared to Dr. Capps' original model, under the second model the following coefficients changed: (1) Shelf Stable Vanilla: a ███ decrease; (2) Shelf Stable Original: a ███ decrease; (3) Shelf Stable Chocolate: a ███ decrease; (4) Refrigerated Vanilla: a ███ decrease; (5) Refrigerated Original: a ███ decrease; and (6) Refrigerated Chocolate: a ███ decrease. These are significant changes that Defendant should have been allowed to address during expert discovery.[4] The Court concludes that it would be prejudicial to admit Dr. Capps' Second Supplemental Report because the new damages model is fundamentally different from Dr. Capps' original model and came more than a month after the close of expert discovery.

The Court therefore grants Defendant's request to exclude Dr. Capps' Second Supplemental Report as an untimely disclosure under Rule 37(c).

**B.      Motion to Decertify - Rule 23(b)(3) Predominance**

The Court now turns to the substance of Defendant's motion to decertify the damages

---

[4] The Court notes that Plaintiff seeks yet another bite at the apple. In his opposition to the motion to decertify the class, Plaintiff asserts that he will abandon his evaporated cane juice claim and requests that the Court amend the class definition to limit the class to consumers who relied on Defendant's "All Natural" labeling claim. Plaintiff presumably does so to address Dr. Ugone's criticism, as originally detailed in his rebuttal report, that Dr. Capps did not separate out the effect of the two distinct labeling claims. First, as with the excluded second damages model, this change comes too late and gives Defendant no opportunity to meaningfully respond. Second, the Court concludes that Plaintiff's proposed amendment is irrelevant in light of the Court's conclusion that neither the original damages model nor the excluded second damages model pass muster under *Comcast* for reasons other than the models' failure to separate the effects of the two labeling claims.

14

United States District Court
Northern District of California

1  class. Defendant contends that Plaintiff's damages models suffer from "incurable deficiencies"

2  that render the damages models incapable of satisfying *Comcast*. The Court begins by describing

3  Dr. Capps' original damages model, as put forth in his opening expert report, and then turns to the

4  alleged flaws with the model's methodology. In the interest of thoroughness, the Court then

5  addresses the excluded second damages model and alternative *Anstine* damages calculation.

6        For a class action to be certified under Rule 23(b)(3), the class representative must show

7  that "questions of law or fact common to the members of the class predominate over any questions

8  affecting only individual members and that a class action is superior to other available methods for

9  the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Only the

10  predominance requirement is at issue here.

11        "The Rule 23(b)(3) predominance inquiry" is meant to "test[] whether proposed classes are

12  sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*,

13  521 U.S. 591, 623 (1997). "When common questions present a significant aspect of the case and

14  they can be resolved for all members of the class in a single adjudication, there is clear

15  justification for handling the dispute on a representative rather than on an individual basis."

16  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted).

17        To satisfy the Rule 23(b)(3) predominance requirement, a plaintiff must present a damages

18  model that is "consistent with [his or her] liability case." *Comcast*, 133 S. Ct. at 1433 (internal

19  quotation marks omitted). More specifically, the regression "model purporting to serve as

20  evidence of damages in this class action must measure only those damages attributable to [the

21  defendant's conduct]." *Id.* At this stage, however, "[c]alculations need not be exact." *Id.*

22        Plaintiff's damages model seeks to prove restitution damages, a remedy whose purpose is

23  "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership

24  interest." *Kor. Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). The UCL,

25  FAL, and CLRA authorize trial courts to grant restitution to private litigants asserting claims

26  under those statutes. *See Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 694 (Ct.

15

27

28

*United States District Court*
*Northern District of California*

App. 2006). The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received. *See id.* at 700 (rejecting restitutionary award for products "Made in U.S.A." where expert "did not attempt to quantify either the dollar value of the consumer impact or the advantage realized by [the defendant]"). This calculation contemplates the production of evidence that attaches a dollar value to the "consumer impact" caused by the unlawful business practices. *Id.* Restitution is then determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices. *Werdebaugh v. Blue Diamond Growers*, No. 12 -2724, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014). Accordingly, Werdebaugh must present a damages methodology that can determine the price premium attributable to Blue Diamond's use of the "All Natural" and "evaporated cane juice" label statements.

### 1.      The Regression Model

In support of Plaintiff's motion for class certification, Dr. Capps proposed a regression analysis that would quantify the damages attributable to Defendant's use of "All Natural" and "evaporated cane juice" on product labels by using a regression analysis. "Regression analysis involves the quantification of the relationship between a variable to be explained, known as the dependent variable and additional variables that are thought to produce or to be associated with the dependent variable, known as the explanatory or independent variables." Capps Report, ECF 165-8, ¶ 6. According to Dr. Capps, regression analysis makes it "possible to isolate the consequence of the alleged misrepresentation by controlling for all other factors that may affect the **prices and/or volume sold** of the identified products." *Id.* "[C]ommonly recognized factors . . . associated with sales [include] price of the product, prices of competing and complementary products, income, advertising, and seasonality." *Id* ¶ 7. The goal of regression analysis is "to isolate whether a particular relationship exists between the dependent and independent variables and [to] measure[e] the magnitude of this relationship while controlling for other factors that could

16

United States District Court
Northern District of California

1    also influence the dependent variable." *Id.*

2          The Court preliminarily approved Dr. Capps' proposed "before and after" regression

3    analysis, which would have compared differences in sales of Defendant's products before and

4    after Defendant began using the labeling language "All Natural" and "evaporated cane juice."

5    Class Cert. Order at 42. However, the damages model submitted by Dr. Capps in his opening

6    expert report does not rely on a "before and after" regression analysis. Following the close of fact

7    discovery, Dr. Capps concluded that he could not conduct a "before and after" analysis because

8    "there were no weekly periods in which to ascertain a before and after the labeling of the language

9    'evaporated cane juice' and/or 'All Natural' for Blue Diamond products." Capps Report ¶ 15.

10   Instead, Dr. Capps conducted a hedonic regression analysis, which he explained as follows:

11                  The hedonic regression allows us to attribute the impact on price
                    associated with various product attributes including product labels.
12                  Intrinsic values of the various attributes may be recovered by
                    specifying the prices of food products as a function of these
13                  attributes. In this litigation, to implement the hedonic regression
                    approach, we must consider prices of the Defendant's products (with
14                  the labeling claim) as well as prices of comparable products (with or
                    without the labeling claim). In this way, with the hedonic regression
15                  approach, we are in position to isolate the impact of the
                    ["evaporated cane juice" and/or "All Natural"] labeling claim[s] on
16                  the prices of [Blue Diamond products].

17   *Id.* By "controlling for other attributes that may impact product prices in the regression analysis,"

18   Dr. Capps affirmed that he could "ascertain the impact of the labeling claim[s] on prices of the

19   respective products." *Id.* In order to do so, Dr. Capps identified "null and alternative hypotheses":

20   that the label claims either have no impact on the prices of Blue Diamond's challenged products

21   ("null hypothesis") or that the labeling claims are "positively associated with the aforementioned

22   prices" ("alternative hypothesis"). *Id.* ¶ 18.

23          As a general matter, Dr. Capps' hedonic regression analysis may be characterized as a

24   three-step process. Motion at 7. First, Dr. Capps assembled a dataset of California milk substitute

25   retail sales data from January 2009 to June 2014 for the following product types: shelf stable

26   original; shelf stable vanilla; shelf stable chocolate; refrigerated original; refrigerated vanilla; and

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California

refrigerated chocolate. Capps Report ¶ 13. These data from Information Resources, Inc. ("IRI") covered 284 weeks' worth of information and included dollar sales, unit sales, and volume sales. *Id.* This methodology is known as a "revealed preference approach" because it relies on data from actual retail transactions. *Id.* ¶ 18. Second, Dr. Capps used this dataset to perform a hedonic price regression analysis to determine whether the use of "evaporated cane juice" and/or "All Natural" labeling claims resulted in higher prices when controlling for designated factors. *Id.* ¶¶ 18–27. Third, Dr. Capps calculated his damages figures by multiplying the price premium estimates from the hedonic price regression analysis by Blue Diamond's total wholesale dollar sales of the challenged products in California over the class period. *Id.* ¶¶ 28, 33.

More specifically, Dr. Capps used retail sales data from IRI for each of the six challenged product types and performed six separate hedonic price regressions, which resulted in six coefficients, e.g., the percentage change in price purportedly attributable to the labeling claims. *Id.* ¶ 26. The hedonic regression analysis used the following variables: (1) price, the "dependent variable"; and (2) a set of "explanatory variables," namely package size, seasonality, year, brand, and the presence or absence of the labeling claims "'evaporated cane juice' and/or 'All Natural.'" *Id.* ¶ 20. The explanatory variables are "dummy variables," that is, variables which "take[] on only two values, usually 0 and 1, with one value indicating the presence of a characteristic, attribute or effect (1) and the other value indicating its absence (0)." Motion at 8 n.6; Capps Report ¶ 20. For each regression, Dr. Capps concluded that the coefficient associated with the labeling claims was "economically and statistically significant" and could be "interpreted as the percentage change in price attributed to the labeling claims, controlling for all other factors." Capps Report ¶ 26. Ultimately, after multiplying the labeling claim coefficient (in percentage form) by Defendant's aggregate dollar sales in California during the class period, Dr. Capps produced a total aggregate damages figure of ███ ███ dollars.[5] *Id.* ¶¶ 33–35.

---

[5] The aggregate restitution and damages associated with Blue Diamond's challenged shelf stable products was calculated to be ███ ███ dollars. Capps Report ¶¶ 33–35. The aggregate

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California

1    In addition to the hedonic price regression analysis, Dr. Capps also presented an alternative

2    damages figure based on a 2007 study conducted by Prof. Jeffrey Anstine. *Id.* ¶ 36 (citing Jeffrey

3    Anstine, *Organic and All Natural: Do Consumers Know the Difference?*, 26 J. Applied Econ. &

4    Pol'y 15 (2007)). Prof. Anstine's study found a price premium of roughly 40% for yogurt labeled

5    "All Natural." Applying that price premium, Dr. Capps also derived an alternative damages figure

6    of ███ ██████ dollars.[6]

### 2. The Model's Alleged Flaws

8    Defendant contends that: (1) the model conflates the effect of the alleged mislabeling with

9    the value of Blue Diamond's brand; (2) the model fails to control for other key factors impacting

10   price; (3) Dr. Capps' reliance on the Anstine study fails *Comcast*; (4) the model falsely assumes

11   that Blue Diamond's products are the only products that use the alleged mislabeling; and (5) the

12   model incorrectly combines the "evaporated cane juice" and "All Natural" labeling statements into

13   a single variable. The Court concludes that Defendant's first three arguments are sufficient to

14   defeat Plaintiff's damages model and alternative damages calculation. Moreover, Defendant's

15   second and third arguments are sufficient to defeat Plaintiff's excluded second damages model.

16   Accordingly, the Court does not address Blue Diamond's remaining contentions.

### a. Conflation of Brand and Labeling Claims

18   At the instant stage of litigation, the Court must consider whether Plaintiff's damages

19   model "measure[s] only those damages attributable" to his theory of injury. *See Comcast*, 133 S.

20   Ct. at 1433. Defendant argues that Dr. Capps' damages model conflates the effect of the value of

21   Blue Diamond's brand with the effect of the use of "evaporated cane juice" and/or "All Natural"

22   on the labels of the challenged products. Dr. Capps did, in fact, assume that only Blue Diamond

---

restitution and damages associated with Blue Diamond's challenged refrigerated products was
███ ██████ dollars. *Id.*
The ███████ dollar figure breaks down to ███████ dollars for Defendant's challenged
refrigerated products and ███████ dollars for Defendant's challenged shelf stable products.
Capps Report ¶ 36.

19

products used the challenged labeling claims and that no competitor products used the challenged labeling claims. Capps Report ¶ 21. Defendant argues that this assumption is factually incorrect as other brands, including Silk and Pacific, used the labeling language at issue during the class period. More importantly, Dr. Capps corrected for problems caused by his assumption by collapsing the Blue Diamond "brand" and "label" variables into a single variable. Consequently, Dr. Capps' model cannot isolate the harm (e.g., the price premium) attributable only to the labeling claims, rather than to the joint effect of both the labeling claims and the value of Blue Diamond's brand.

According to Defendant's expert, Dr. Ugone, "Dr. Capps' model contains only one variable for both the Blue Diamond brand and for the at-issue label statements (and that variable is the same variable), and as a result Dr. Capps cannot distinguish the effects of brand name from the effects of the at-issue label statements." Ugone Rebuttal ¶ 27. More specifically, as coded in Dr. Capps' model, whenever the value of the Blue Diamond dummy variable is equal to 1, the value of the labeling claim variable must always be 1 and vice versa. *Id.* Where "knowing the value of one [variable] always predicts the value of the other [variable]," the variables are "perfectly collinear," which renders the regression incapable of separating out the independent effects of each variable. *Id.*; *see also Brazil*, 2014 WL 5794873, at *9. In order to address the perfect collinearity problem, Dr. Capps' model omits the Blue Diamond brand variable from the regression altogether. Ugone Rebuttal ¶ 35 (citing Exhibits F-1 through G-3 of Dr. Capps' Report). As a functional matter, this omission means that the damages model's coefficient for the labeling claim captures both the price premium attributable to the value of Blue Diamond's brand and the price premium attributable to Blue Diamond's use of the labeling claims.

The Court concludes that the perfect collinearity problem here renders the damages model insufficient under *Comcast* because Dr. Capps' model is incapable of isolating the damages attributable to Defendant's alleged wrongdoing. *See Comcast*, 133 S. Ct. at 1433. Instead, Dr. Capps' methodology measures the "*combined effect*" of Blue Diamond's brand value and Blue

20

United States District Court
Northern District of California

1    Diamond's use of "evaporated cane juice" and/or "All Natural" on the prices of the challenged

2    products. Motion at 15. In opposition, Plaintiff relies on this Court's recent decision in *Brazil v.*

3    *Dole*, 2014 WL 5794873, at *9. However, Dr. Capps' omission of the Blue Diamond brand

4    variable altogether is factually distinct from the "bundling" scenario this Court addressed in

5    *Brazil*. In *Brazil*, Dr. Capps created a similar perfect collinearity problem by assuming that only

6    the defendant, Dole Packaged Foods, LLC, used the labeling claims at issue and coding the

7    variables for "brand" and "label" to be perfectly collinear. *Id.* Dr. Capps addressed the perfect

8    collinearity problem in *Brazil* by "bundling" all the other brands while retaining the Dole brand

9    variable in the model. By doing so, Dr. Capps appeared to control for the value of Dole's brand,

10   even though the defendant took issue with whether the damages model in *Brazil* controlled for the

11   individual value of each competitor's brand. *See id.*

12          In contrast, in the damages model at issue here, Dr. Capps omitted the brand variable for

13   Blue Diamond altogether while retaining the individual brand variables such as Silk, Pacific,

14   Kikkoman Pearl, 8th Continent, So Delicious, and Soy Dream. Moreover, Dr. Capps offers no

15   explanation or argument as to how the damages model could still control for the value of Blue

16   Diamond's brand. *See* Capps Reply ¶¶ 12–14. To the contrary, Dr. Capps' sole response is that

17   Defendant's criticism "assumes there is additional value to the Blue Diamond brand name separate

18   from the Blue Diamond all-natural claim value." Capps Reply ¶ 12. However, as noted in both

19   *Brazil* and in this Court's class certification order in the instant case, it is "essential that Dr.

20   Capps' model control for brand loyalty . . . [i]ndeed, what the Court wants to know is that the

21   proffered damages model isolates the price premium attributable to [the defendant's] labeling

22   claim only, rather than any premium attributable to consumers' loyalty to the [defendant's]

23   brand." *Brazil*, 2014 WL 5794873, at *9; Class Cert. Order at 41. Furthermore, Dr. Capps himself

24   identified brand loyalty as a relevant factor to be controlled for in the damages analysis. Capps

25   Report ¶¶ 19–20. Here, the Court concludes that Dr. Capps' damages model in this case cannot

26   measure the price premium attributable only to Blue Diamond's use of the "evaporated cane juice"

21

United States District Court
Northern District of California

1    and/or "All Natural" labeling claims. *See Comcast*, 133 S. Ct. at 143.

2            This methodological failure alone is sufficient for the Court to conclude that Plaintiff has

3    failed to put forth damages limited to Defendant's liability in this case, as required by Rule

4    23(b)(3). However, the Court acknowledges that Plaintiff's untimely second damages model and

5    alternative damages calculation based on the Anstine study may not suffer from this same flaw. In

6    the interest of thoroughness, the Court addresses an additional methodological flaw that affects

7    both the original damages model and the second damages model put forth in Dr. Capps' untimely

8    Second Supplemental Report. The Court also reviews Plaintiff's alternative damages calculation

9    based on the Anstine study.

10                        **b.        Controlling for Other Critical Variables**

11            Blue Diamond also argues that Dr. Capps' damages model fails *Comcast* because it does

12   not control for other critical factors that impact price. In the Court's class certification order, the

13   Court relied on Dr. Capps' representations that his damages model would control for important

14   variables such as advertising, seasonality, income, and regional price differences. *See* Class Cert.

15   Order at 42–43. Defendant argues that Dr. Capps' model fails to control for advertising, regional

16   price differences, and price differences attributable to type of distribution channel.

17            The Court agrees with Blue Diamond that Plaintiff has failed to show how the damages

18   model controls for advertising. In response, Dr. Capps offers contradictory explanations and

19   arguments. In his first supplemental report, Dr. Capps asserted that he controlled for advertising

20   and promotions "via [the] quarterly and year dummy variables." Capps Reply ¶ 23. In his

21   declaration submitted two weeks later, Dr. Capps argued that a hedonic regression analysis "do[es]

22   not need to control for advertising because we are trying to measure the price premium and not

23   how advertising impacted this price premium." Declaration of Oral Capps, Jr. in support of

24   Plaintiff's Opposition to Blue Diamond's Motion to Decertify Class Action, ("Capps Decl."), ECF

25   No. 175-5, ¶¶ 11–15. However, it is precisely because advertising may impact the price premium

26   that Dr. Capps' damages model must control for advertising. *See, e.g.*, *Brazil*, 2014 WL 5794873,

27                                                     22

United States District Court
Northern District of California

at *11. Dr. Capps himself identified advertising as a relevant factor that affects the prices of the challenged products and represented in Plaintiff's class certification motion that Dr. Capps' model would control for this factor. *See* Class Cert Order at 42–43. As the model does not control for the impact of advertising on price, the Court is unable to determine how much of the purported price premium is due to Defendant's use of the at-issue labeling claims, as opposed to Defendant's successful advertising campaigns or promotions.

Despite his later inconsistent statements, Dr. Capps initially contended that he controlled for advertising via his quarterly and year dummy variables. However, as the Court noted in *Brazil*,

> [Dr. Capps] does not explain how seasonal spikes in advertising—say, for the holiday season—affect [Defendant] differently than any other brand. All brands may spend more on advertising during the holidays. If so, the seasonality variable may be incapable of differentiating across brands, and the model would erroneously treat [Defendant], which may spend much more on advertising than its competitors, the same as its competitors in this regard. The Court would not know, then, how much of the identified premium was due to [Defendant's] . . . labeling claim[s] and how much was due to its advertising expenditures.

*Brazil*, 2014 WL 5794873, at *11. As the Court concluded in *Brazil*, Dr. Capps has failed to explain how his use of quarterly and year dummy variables controls for the impact of advertising on the price premium. Moreover, to the extent Dr. Capps contends it would be onerous to collect and code data for advertising expenditures, that argument is unavailing. *See* Capps Decl. at 5 n.4; *see also Brazil*, 2014 WL 5794873, at *11 (citing *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014)).

Defendant also argues that Plaintiff's damages model does not control for the effect of regional differences and distribution channel on price. More specifically, Defendant contends that there are regional and distribution channel differences in prices of Blue Diamond products, and that the damages model must account for these price differences. *See* Ugone Rebuttal ¶ 61. However, Dr. Capps did attempt to control for regional price differences and distribution channels by using a "weighted average price per ounce" as the dependent variable. Opp. at 19. According to

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California

1    Dr. Capps, the weighted average prices are "representative prices to all the class members," and

2    because "any price difference attributable to region or distribution channel is part of the dependent

3    variable, there is no need to use" separate explanatory variables for region and distribution

4    channel. *Id.* In other words, Dr. Capps accounts for the fact that the same product might cost $4.00

5    in San Francisco at a premium grocer and $2.00 in Sacramento at a discount outlet by using a

6    single "average" price between $2.00 and $4.00 instead of creating independent variables which

7    isolate and measure the effects of regional differences and distribution channel on price. While it

8    may be the case that this method results in a less precise damages figure than if Dr. Capps had

9    used the actual prices and then controlled for regional and distribution channel differences, the

10   Court is not convinced that this imprecision alone is enough to run afoul of *Comcast*. *See, e.g.,*

11   *Story Parchment Co v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (damages

12   calculations need not be exact). However, in light of the Court's conclusion that the damages

13   model also fails to control for advertising altogether, this imprecision certainly does not weigh in

14   favor of the model's ability to measure damages that are consistent with Plaintiff's liability case.

15   *See* Class Cert. Order at 43–44; *Comcast*, 133 S. Ct. at 1433.

16        In summary, the Court concludes that Plaintiff's damages model fails to control for the

17   effect of advertising on price. That failure renders the model incapable of providing a damages

18   figure that is consistent with Plaintiff's liability case, as the Court cannot determine whether the

19   price premiums result from Defendant's use of "evaporated cane juice" and/or "All Natural" on its

20   labels or from Defendant's successful advertising and promotional expenditures. Moreover,

21   Plaintiff's excluded second damages model also suffers from this flaw. Even if the Court had been

22   inclined to admit Dr. Capps' untimely report, the Court concludes that the second damages model

23   also "identifies damages that are not the result of the wrong," and therefore would not support a

24   Rule 23(b)(3) damages class. *See Comcast*, 133 S. Ct. at 1434. Contrary to Defendant's

25   contention, however, Plaintiff's use of a weighted average price alone is not independently

26   problematic under *Comcast*.

27                                                                                    24

28

United States District Court
Northern District of California

### c.       Alternative Damages Calculation Based on the Anstine Study

In addition to Plaintiff's original damages model and excluded second damages model, Dr. Capps also provides an "alternative" damages figure based on a 2007 study done by Prof. Anstine. The Court has previously rejected Dr. Capps' attempts to "simply borrow[] the hedonic regression coefficient from Prof. Anstine's 2007 study evaluating the price premium of the "All Natural" label claim on yogurt," as barred under *Comcast. See Brazil*, 2014 WL 5794873, at *14. Nothing in that 2007 study purports to measure the price premium attributable to Blue Diamond's use of "evaporated cane juice" and/or "All Natural" on the labels of the challenged products. Plaintiff's bare assertion that almond milk products are "similar food products to yogurt products" is insufficient to establish any reasonable inference that the results of Prof. Anstine's study bear any relation to Defendant's liability in this case. Prof. Anstine's study examined purchases of yogurt in upper-middle class neighborhoods in New Jersey in 1999, approximately 15 years ago. Ugone Rebuttal ¶¶ 76–77. Plaintiff has not explained how this study offers reasonable insight into purchases of almond milk beverages across California in the last 5 years. Absent such explanation, the Court concludes that Prof. Anstine's study does not and cannot measure the damages attributable to Defendant's conduct in the instant case.

### d.       Other Flaws[7]

Finally, the Court is troubled by Dr. Capps' continued failure to ensure the accuracy of his assumptions in developing his damages model. This is not merely a problem of erroneous data, but is in fact a fundamental flaw with Dr. Capps' methodology. Dr. Capps asserts that hedonic price regression analysis is able to isolate the value of a particular attribute by "consider[ing] prices of the Defendant's products (with the labeling claim) as well as prices of comparable products (with or without the labeling claim)." Capps Report ¶ 8. Dr. Capps' application of the hedonic price regression analysis to this particular damages model, however, is highly problematic. Dr. Capps

---

[7] The Court declines to reach the remainder of Defendant's arguments in support of its motion to decertify the damages class.

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

assumes, without investigating, that all competitor products do not use the labeling claims at issue. Without knowing whether or not the prices of comparable products are actually affected by the relevant labeling claims, how can the model accurately isolate the value of the labeling claim to Defendant's product? The flaws with regards to the "brand" and "label" variables and failure to control for the effect of advertising only compound the Court's concern that Dr. Capps' damages model is an ineffective example of a hedonic price regression. The Court is left with no choice but to conclude that Dr. Capps' model cannot reasonably determine the measure of damages attributable to Defendant's wrongful conduct.[8] *See also Brazil*, 2014 WL 5794873, at *12; *Lindell v. Synthes USA*, No. 11-02053, 2014 WL 841738, at *14 (E.D. Cal. Mar. 4, 2014).

Plaintiff argues that Dr. Capps' damages model is sufficient to satisfy Rule 23(b)(3) notwithstanding the failures and flaws identified above because Defendant has not contested the validity of using a hedonic regression in the abstract. *See* Opp. at 4, 6. Specifically, Plaintiff contends that "the soundness of the methodology . . . is the only issue at class certification," and relies on *Levya v. Medline Inst. Inc.*, 716 F.3d 510 (9th Cir. 2013), and *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014), for the proposition that individual questions as to damages cannot independently defeat class certification.

As an initial matter, Plaintiff cites no authority for the overbroad proposition that the Court is limited to reviewing "the soundness of the methodology" in the abstract at the class certification stage. To the contrary, the Court is obligated to do more than rubberstamp a proposed damages class merely because a plaintiff's expert purports to have used a peer reviewed methodology such as a regression analysis. *See Amgen Inc.*, 133 S. Ct. at 1194 ("[A] court's class-certification analysis must be 'rigorous'. . . ."). Moreover, in *Comcast*, the Supreme Court noted that while the plaintiff's "methodology *might have been sound*, and might have produced commonality of damages," the mismatch between the damages model and the plaintiff's liability case made class

---

[8] Dr. Capps made similar assumptions in his second damages model. Though he did fix some data points, he does not represent that he verified the labels of the other competitor brands. *See* n.3.

26

United States District Court
Northern District of California

1   certification inappropriate under Rule 23(b)(3). 133 S. Ct. at 1434 (emphasis added); *see also In re*

2   *Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491–92 (N.D. Cal. 2008) (citing cases

3   denying class certification where proposed damages models failed to provide reliable measures of

4   damages). The Court therefore rejects Plaintiff's legally erroneous assertion.

5         Furthermore, to the extent Plaintiff relies on the Ninth Circuit's decisions in *Levya* and

6   *Jimenez* to contend that the problems with Dr. Capps' damages model cannot defeat class

7   certification, Plaintiff misapplies that authority. Both *Levya* and *Jimenez* stand for the established

8   proposition that a class may be certified even if individualized damages calculations will be

9   necessary. *See Levya*, 716 F.3d at 513–14; *Jimenez*, 765 F.3d at 1167–78. When read in

10  conjunction with the Supreme Court's decision in *Comcast*, these cases set forth the unremarkable

11  principle that "[s]o long as the damages can be determined and attributed to a plaintiff's theory of

12  liability, damage calculations for individual class members do not defeat certification." *Lindell*,

13  2014 WL 841738, at *14; *see Comcast*, 133 S. Ct. at 1434. In the instant case, the Court does not

14  conclude that individual issues predominate on damages calculations because some consumers

15  suffered more or less harm than others. *See, e.g.*, *Levya*, 716 F.3d at 514. Rather, the Court

16  concludes that Plaintiff has failed to show that his proposed "damages stemmed from the

17  defendant's actions that created the legal liability." *Leyva*, 716 F.3d at 514; *see also Comcast*, 133

18  S. Ct. at 1434; *Brazil*, 2014 WL  5794873, at *14. This failure defeats the certification of a

19  damages class under Rule 23(b)(3).

20        Finally, Plaintiff also relies on *Levya* and *Jimenez* to assert that the Rule 23(b)(3) "class

21  should remain certified and [the Court should reserve] any damage calculations for later."[9] Opp. at

---

[9] To the extent Plaintiff appears to be requesting, for the first time, that the Court certify a class for liability purposes only under Rule 23(c)(4), the Court denies Plaintiff's cursory request. As it is a matter of discretion, the Court is not obligated to certify a class for liability purposes merely because Plaintiff asserts the Court "must" do so. Plaintiff has provided no reason why bifurcation of liability and damages would be appropriate in the instant case, or why proceeding on a class basis as to liability would address the more fundamental problem that Plaintiff is apparently unable to provide a measure of damages limited to Plaintiff's liability case.

27

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California

11 (citing *Lilly v. Jamba Juice Company*, No. 13-cv-2998-JST, 2014 WL 4652283 (N.D. Cal. Sept. 18, 2014)). This argument again misunderstands the interaction between *Levya* and *Comcast*, and their applicability to the instant case. The Court is not decertifying the Rule 23(b)(3) damages class because of the need for individualized damages calculations. Rather, Plaintiff has failed to put forth evidence that damages can be "determined and attributed to plaintiff's theory of liability" on a classwide basis. *See Lindell*, 2014 WL 841738, at *14. In the instant case, the Court had preliminarily certified a damages class under Rule 23(b)(3) based on Plaintiff's representations that he would put forth evidence of damages limited to the injuries allegedly caused by Defendant's use of "evaporated cane juice" and/or "All Natural" on its product labels. As discussed above, Plaintiff has failed to do so. As such, the Court concludes that Plaintiff has failed to satisfy the predominance requirement under Rule 23(b)(3).

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to decertify. The Court DENIES as moot Defendant's request for a non-testimonial *Daubert* review.

**IT IS SO ORDERED**.

Dated: December 15, 2014

_____
LUCY H. KOH
United States District Judge

Case No.: 12-CV-02724-LHK
ORDER GRANTING MOTION TO DECERTIFY

United States District Court
Northern District of California